

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DOUGLAS FOSTER, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) Case No. 04 C 5850 |
| ANTHONY DELUCA, and CITY OF CHICAGO HEIGHTS, | ) ) HONORABLE CHARLES R. NORGLE ) ) |
| Defendants. | ) |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.

**I. BACKGROUND**[1]

**A. Facts**

Douglas Foster ("Foster") is 53 years old, and worked for the City of Chicago Heights from 1980 until he was terminated on May 9, 2003. During his time in Chicago Heights, Foster served as the Superintendent of the Water Department and Director of Public Works. Foster was appointed to the Director of Public Works on October 1, 2000, by then Mayor Angelo Ciambrone ("Ciambrone"). As Director of Public Works, Foster supervised three departments: the Water

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

Department, Streets and Sewers, and the Maintenance Department. In addition, Foster attended monthly mayoral department head meetings.

Candidates in Chicago Heights run for office under nonpartisan groups such as "Renaissance," "FUEL," and "Change." In 2002, Ciambrone decided not to run for re-election as mayor of Chicago Heights for the 2003 contest. Paulnita Rees ("Rees"), Ciambrone's Manager of Administrative Operations took his place on the ballot. Other candidates in the 2003 election included Anthony DeLuca ("DeLuca"), David Zerante ("Zerante"), and three others, who ran under various party groups. DeLuca ran under the "Change" party. In Chicago Heights, the top two candidates with the most votes in the primary or run off face each other in the general election. In the February 2003 run off, Zerante and DeLuca received the most votes, and took part in the general election. After Rees lost the run off, she was slow to give her support to either candidate. Eventually, Rees stated that she would vote for Zerante, because she is a registered Democrat.

During the Ciambrone administration, employees' salaries and benefits constituted a major expense of the City's budget. Foster had one of the highest salaries of a department head in the City. According to Defendants, the rising cost of health care was "killing" the City. Ciambrone attempted to raise money by bringing in new businesses, and convincing other businesses to stay within the city. Furthermore, Defendants contend that in the eight years that Ciambrone served as mayor, he was unable to fix the budget. On October 4, 2001, Joan Bauer ("Bauer") the City Treasurer, wrote a memo to Ciambrone which stated that if serious changes were not made, either through staff reduction, or finding other sources of income, the city would not be able to pay its bills.

According to Defendants, the City's financial situation was an issue during the 2003 Mayoral campaign. Rees wanted to bring new business into the city, as opposed to cutting the budget. DeLuca wanted to run the city like a business. Ciambrone stated that a key issue in the 2003 race was declining revenue due to the City's loss of commercial businesses. Defendants claim that all the candidates emphasized that for the city to maintain financial stability, a payroll reduction was necessary.

Furthermore, Foster claims that during the 2003 election, Alice Thiel ("Thiel"), Deborah Harper ("Harper"), Jan Ballard ("Ballard"), Kenya Johnson ("Johnson"), Naomi Brodnick ("Brodnick"), Rita Starkey ("Starkey"), Robert Boehl ("Boehl"), and Stacey Foster ("Ms. Foster") worked at Rees' campaign headquarters during the election, and also made financial contributions to Rees' campaign fund. Defendants, on the other hand, deny that Boehl, Johnson or Starkey worked for Rees in 2003 or donated to her election fund.

On May 5, 2003, Anthony DeLuca was sworn in as Mayor of Chicago Heights. That same day, Foster was advised by the Mayor's Chief of Staff that his position of Director of Public Works was eliminated, and three new positions were created in its place. According to the Defendants, the Director of Public Works position was eliminated in order to restructure various governmental departments. The three new positions were: Director of Water, Director of Streets and Sewers, and Director of Maintenance. Then, on May 6, 2003, Dan Proft ("Proft") replaced Rees and Dominic Candeloro ("Candeloro") as Chief of Staff. In an effort to keep true to his campaign platform of budget reduction, DeLuca began to trim the employee roster of positions that his administration believed could be absorbed by the current personnel.

3

On May 16, 2003, Ms. Foster was terminated from her position with the City. Ms. Foster worked in the Human Resources department as an Insurance Coordinator, and assessed claims filed by employees. Approximately 85 percent of Ms. Foster's time was spent processing employee medical claims. Defendants claim that Ms. Foster was terminated as a result of cost-cutting measures, and that recent changes in the law under the Health Insurance Portability and Accountability Act ("HIPAA") made her position expendable.

On January 30, 2004, Halperin's employment with the city was terminated. Halperin worked for the city from April 1989 through 2004. Her duties were mainly secretarial. Halperin claimed that she believed she lost her job as a result of her political affiliation. Specifically, Halperin felt that DeLuca knew she supported Ciambrone instead of himself, and that she wasn't seen around DeLuca's campaign headquarters during the election.

Additionally, other employees who worked on Rees' campaign were terminated soon after DeLuca took office. Boehl, who was the Public Works Supervisor from 2001 was terminated on August 4, 2003. Defendants claim that Boehl was terminated because the work performed by the Public Works Department was duplicative of work done by other departments.

Zerante, who was the head of the Purchasing Department, was fired on May 8, 2003. Defendants allege that Zerante was fired as a result of operational problems, which resulted in a "lack of centralization." In order to cure budget concerns, Matt Fares ("Fares") was hired to replace Zerante. Fares had purchasing experience in the private sector, prior to his employment with the city.

Furthermore, Defendants allege that in an attempt to ease the burden on employees who were terminated, DeLuca's administration paid these former employees some accumulated sick

4

leave after the last day of work. Additionally, Boehl was allowed to remain on the payroll in order to receive municipal retirement benefits. In order for eligibility for the municipal retirement benefit plan ("IMRF"), an employee must have eight years of employment with a municipality. When Boehl was terminated in August 2003, he needed four months to qualify for the IMRF. DeLuca's administration extended his time on the city payroll to January 15, 2004, in order for Boehl to receive his pension.

Furthermore, Defendants claim that they gave Rees, Zerantes, Johnson, and Foster sick pay and benefits after their last days of work. Foster received health coverage through July 31, 2003. Additionally, Foster requested all of his accumulated sick time, a total of 150 days, or 1,200 hours. The total amount for that sick time totaled $44,556.00. Because DeLuca was trying to cure the city's budget problems, he did not grant Foster's request for all of the accumulated sick time. Instead, Foster was given a total of 64 hours sick pay, which totaled $2,376.32.

## B. Procedural History

On September 7, 2004, Foster filed his three count Complaint alleging political retaliation, in violation of 42 U.S.C. § 1983, age discrimination for Defendants failure to pay Foster his sick pay, in violation of the Age Discrimination in Employment Act ("ADEA"), and an ERISA claim for the same sick pay. On November 5, 2004, Defendants filed their first Motion for Summary Judgment, which the court denied on February 9, 2005. See Foster v. DeLuca, 2005 WL 1273015, *1 (N.D. Ill. 2005). Then, on March 3, 2006, the court struck the trial date, and entered a briefing schedule for Defendants' current Motion for Summary Judgment. On April 7, 2006, Defendants filed their second Motion for Summary Judgment. On May 5, 2006, Foster filed his Response, and the City Replied on May 19, 2006. Defendants'

Motion for Summary Judgment is now fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all

inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

### B. Foster's Political Association Claim

#### *1. The Substantive Law*

Foster alleges that he was fired from his position as Director of Public Works as a result of his political affiliation. As a general proposition, "public employees may not be made to suffer adverse job actions because of their political beliefs." Carlson v. Gorecki, 374 F.3d 461, 464 (7th Cir. 1999). "Hiring, firing, or transferring government employees based on political motivation violates the First Amendment." Hall v. Babb, 389 F.3d 758, 762 (7th Cir. 2004).

It is not enough for the plaintiff to show that he "was of a different political persuasion than the decisionmakers. . . ." Id. The threshold question in a political affiliation claim is "whether the defendants even knew about the political activities of the [Plaintiffs]." Id. Once a plaintiff makes the necessary prima facie showing, "the burden shifts to the defendants to demonstrate a legitimate, nonpolitical reason for the employment decision." Id. (citing Simmons v. Chi. Bd. of Educ., 289 F.3d 488, 495 (7th Cir. 2002)).

7

In order for a plaintiff to establish a prima facie case for "this type of employment discrimination, he must show two things: first, that the plaintiff's conduct was constitutionally protected, and second, that the protected conduct was a substantial or motivating factor in the employment decision." Id. (citing Simmons, 289 F.3d at 495).

Certain exceptions are made "for policymaking positions and for employees having a confidential relationship with a superior." Id. (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 65 (1990)). This exception is known as the "policymaking," or "confidential" employee exception. See Carlson, 374 F.3d at 464 (citing Branti v. Finkel, 445 U.S. 507, 517-18 (1980)). Put another way, "the critical inquiry is whether party affiliation is an appropriate requirement for performing the job." Id. (citing Thompson v. Illinois Dept. of Professional Regulation, 300 F.3d 750, 755-56 (7th Cir. 2002)). Whether party affiliation is necessary for the job in question is determined by a "functional test that examines the powers and duties inherent in the position." Carlson, 374 F.3d at 464. Employees "who have merely ministerial duties-who really have very little discretion-and employees whose discretion is channeled by professional rather than political norms. . . are not within the exception for policymakers." Riley v. Blagojevich, 425 F.3d 357, 360 (7th Cir. 2005). With these principles in mind, we turn to Foster's claim.

### 2. *Foster does not fall under the policymaking employee exception*

As a preliminary matter, Foster states that as Director of Public Works, his job included instructing city employees, such as the foremen in the Street Department, and supervisors in the Sewer Department and Water Department. Additionally, Foster authorized overtime pay for these departments, and disciplined employees when so required. He was responsible for the maintenance of the City's water supply system and all of the equipment and machinery.

8

However, Defendants view Foster as an employee who was responsible for policy making decisions, by virtue of his presence at the monthly mayoral staff meetings. The court finds that there was nothing inherently political about Foster's position within the City of Chicago Heights. His employment was managerial; Foster was only responsible for logistics, and the day to day operations of the city's public works departments. His political affiliation was not a necessary element to adequately perform his job.

### 3. *Foster has established a genuine issue of material fact as to the basis for his termination*

The threshold issue before the court is whether DeLuca was aware of Foster's political activities in support of a different candidate when he was terminated. See Hall, 389 F.3d at 762. Foster's most persuasive argument is that he, along with others who worked at Rees' campaign headquarters, were terminated by DeLuca shortly after he was sworn into office, while city workers who supported DeLuca were not fired. Harper, Starkey, Boehl, and Ms. Foster all worked at Rees' campaign office, yet were terminated due to "budget concerns," according to Defendants. Coincidentally, none of the employees who worked for DeLuca's campaing were fired from their positions in the City, despite this budget crises. Fares, Christina Popolla ("Popolla"), Kaz Rosetto ("Rosetto"), and Michelle Smado ("Smado") all retained employment with the city, despite the DeLuca administration's claims that it was "moving in a new direction."

Furthermore, both DeLuca's and Rees' campaign headquarters were in the same shopping center, and it is reasonable that DeLuca would have seen people leaving and entering Rees' offices, just as Rees could observe people coming and going from DeLuca's headquarters. Foster also states that when he asked DeLuca who would take over as Director of Public Works,

9

DeLuca said that he would bring in his "own people." Based on these facts, the court find that a genuine issue of material fact exists as to whether DeLuca was aware of Foster's political affiliation at the time DeLuca terminated his employment. "A person's holding of an arguably prominent party office could support a finding of common knowledge among decisionmakers. . . ." Hall, 389 F.3d at 762 (internal citations omitted). In the end, it is a "factual question . . . ." Id. Because the issue of DeLuca's knowledge of Foster's political affiliation remains a "factual question," summary judgment cannot be granted in Defendants' favor.

### a. Foster's support of Rees was constitutionally protected

Under the first prong of a political retaliation claim, Foster must show that his conduct was constitutionally protected. Hall, 389 F.3d at 762. Here, it is undisputed that political support to a candidate is a constitutionally protected conduct. See McGreal v. Ostrov, 368 F.3d 657, 677 (7th Cir. 2004). According to Foster, he was an active participant in Rees' campaign, and was regularly seen at her campaign headquarters. Therefore, the court finds that Foster has satisfied the first prong of the analysis.

### b. Questions of fact remain as to whether Foster's termination was politically motivated

Second, Foster must show that his termination was politically motivated. Hall, 389 F.3d at 762. Foster has created a genuine issue of fact on this topic because he and other employees who did not work at DeLuca's campaign during the election were fired shortly after DeLuca took office; and those employees who worked for DeLuca's campaign were not terminated. While it is undisputed that the City had encountered severe economic woes, DeLuca's dismissal of Foster

and other long time city employees who were members of a different political party creates a question of fact as to DeLuca's true intentions.

### 4. *Defendant's Legitimate, Non-Political reason for Foster's Termination*

After Foster has established his prima facie case of political retaliation, the burden shifts to the Defendants to establish a legitimate, non-political reason for their employment decision. See Hall, 389 F.3d at 762. Here, DeLuca claims that the reason for terminating Foster and the other Chicago Heights employees was due strictly to budgetary concerns. However, after DeLuca fired Foster, three new positions were created to take the place of the Director of Public Works. If DeLuca was sincere about his desire to cut governmental waste and reduce the budget, the creation of three new jobs to take the place of a single employee, with over 20 years experience, certainly raises factual questions regarding the motivation behind these actions. As a result, the court finds that there are still genuine issues of material fact as to the true reason for Foster's termination.

In viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could determine that Foster was fired because of his political affiliation. Furthermore, both parties cite separate reasons for Foster's dismissal. Foster claims his termination was politically motivated, while DeLuca claims that it was the result of a budget cut down. At the summary judgment stage, "the party opposing a motion for summary judgment must take reasonable steps to provide the district court sufficient evidence to create a genuine issue of material fact." Shank, 192 F.3d at 683 (citing Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 503-04 (7th Cir. 1999) (indicating that summary judgment is the "put up or shut up" moment in a lawsuit)).

11

Here, any decision on the merits of either party's claim will necessarily force the court to make assumptions as to each party's veracity. "It is rarely appropriate on summary judgment for a district court to make a finding on a state of mind." McGreal, 368 F.3d at 677. As a result, Defendants' Motion for Summary Judgment as to Foster's Political Affiliation claim is denied.

## C. Foster's Age Discrimination Claim

### *1. The substantive law*

Foster next alleges that the City violated the ADEA, when it denied "any compensation to Plaintiff for his accumulated sick time, while compensating two other city employees for sick time, who were substantially younger than Plaintiff. . . ." Compl., ¶ 21. The ADEA prohibits employment discrimination on the basis of age. See 29 U.S.C. § 621; Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir. 2006). However, Foster does not claim that he was fired as a result of his age. In order to establish a violation of the ADEA, plaintiffs are required to show that: (1) they are members of a protected class; (2) they were meeting the employer's legitimate expectations; (3) they were discharged and not rehired or promoted as a result of the employer's reorganization; and (4) the employer treated younger, similarly situated employees more favorably. Grimm v. Alro Steel Corp., 410 F.3d 383, 385 (7th Cir. 2005). If the plaintiff can establish his prima facie case, the "burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse business decision." Id. The burden then shifts back to the plaintiff to present evidence to demonstrate that the employers' proffered reason was pretextual. Id.

A plaintiff "can prove discrimination under the ADEA by presenting either direct or circumstantial evidence that an employer took an adverse job action against him because of his

12

age." Id. Direct evidence "speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates v. Discovery Zone, 116 F.3d 1161, 1170 (7th Cir. 1997). It is likely the case that the only real direct evidence of discriminatory intent is an admission by the employer. Logan v. Kautex Textron N. Am., 259 F.3d 635, 638 (7th Cir. 2001); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994).

A plaintiff can also use the "indirect burden-shifting approach set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973)." Grimm, 410 F.3d at 385. Under the indirect method, the plaintiff may prove discrimination "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" Id. (quoting Cerutti v. BASF Corp., 349 F.3d 1055, 1060-61 (7th Cir. 2003)). With these principles in mind, we turn to Foster's ADEA claim.

## 2. *Foster has not established a prima facie case of age discrimination*

Foster is unable to establish age discrimination through direct evidence. He offers no direct testimony, specific statements, or documents that speak[s] directly to the issue of discriminatory intent, [and] also relate[s] to the specific employment decision in question." Oates, 116 F.3d at 1170. Therefore, Foster must proceed under the indirect burden-shifting method.

Defendants concede that Foster has established the first and second prong of his prima facie case. See Def.'s Mot. for Summ. J., at 20. However, Foster does not allege that he was "discharged and not rehired... as a result of the employer's reorganization." Grimm, 410 F.3d at 385. This alone fails to establish a prima facie claim of age discrimination. However, with an abundance of caution, the court will analyze the fourth prong of the indirect burden-shifting

13

method: Whether Foster can establish that substantially younger employees were treated more favorably.

The employees that Foster identifies as substantially younger are Marcia Givens ("Givens"), 24 years old, Emily Garcia ("Garcia"), 24 years old, and Tamra Lagone ("Lagone"), who was 40 years old. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000) (to satisfy 'substantially younger' requirement, relevant employee must be at least 10 years younger). However, these younger employees cannot be described as similarly situated, because they worked different hours than Foster, and held different positions in the City. Foster was the Director of Public Works, while the younger employees worked in mainly secretarial positions. Moreover, Givens, Garcia, and Lagone each received $717.49, $350.25, and $318.60 respectively in sick pay. Foster, on the other hand, received a total of $2,400.00 in sick pay after he was fired. Given such facts, the younger employees cannot be classified as similarly situated, when they received less money than Foster, and performed completely different tasks. Foster provides the court with no information as to these employees' education, background, and qualifications. See Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). Without such evidence, the other employees cannot be considered similarly situated. See Herron v. DaimlerChrysler, 388 F.3d 293, 300, n.1 (7th Cir. 2004).

### 3. *The City's Legitimate, Non-Discriminatory Reason*

Even though Foster has not established his prima facie case of discrimination, with an abundance of caution, the court will analyze the remainder of the indirect burden-shifting method. There was a significant financial crises when DeLuca became mayor. Rees was aware of this crisis, and attempted to remedy the city's woes by bringing in new business. Bauer,

14

Ciambrone's City Treasurer, wrote a memo predicting severe economic woes if actions were not taken. Each candidate in the election understood that Chicago Heights' economic future and budget crises were main issues in the 2003 election. As a result, it is undisputed that the budget crises was a legitimate concern for public officials in Chicago Heights.

Moreover, Foster requested $44,000.00 in sick pay, as compared to other employees who received $717.49, $350.25, and $318.60. Foster has not cited any cases or presented any evidence to persuade the court that the City's failure to give him $44,000 simply because Foster demanded such payment is discriminatory. Instead, Foster attempts to second guess the City's decision by stating that DeLuca "could have transferred many of the people he fired instead of hiring these new people." Pl.'s Resp. to Def.'s Mot. for Summ. J., at 9. However, this is insufficient to refute the City's legitimate, non-discriminatory reason for its refusal to give Foster $44,000.00 in sick leave pay.

### *4. Foster cannot establish Pretext*

Finally, after the Defendants have put forth a legitimate, non-discriminatory reason for its actions, the burden shifts back to Foster to demonstrate that the proffered reason is pretextual. See Forrester v. Rauland-Borg Corp., -- F.3d --, 2006 WL 1767760, *1 (7th Cir. June 29, 2006); Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). "If it is the true ground and not pretext, the case is over." Forrester, 2006 WL 1767760, *1. However, if the proffered reason "is not the true ground, the employer mat still be innocent of discrimination." Id. (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000)). For example, the employer may have "lied to conceal a reason that was discreditable but not discriminatory." Id. (citing Visser v. Packer Engineering Assoc., Inc., 924 F.2d 655, 657 (7th Cir. 1991)).

Here, Foster submits no evidence to establish that the City's stated reason for not paying Foster his full $44,000.00 in sick pay was pretextual. In his Response memorandum, Foster merely states in a four line paragraph that the evidence of age discrimination "included the pattern of compensating several other terminated employees all of whom were at least five years younger than Plaintiff. . . ." Pl.'s Resp., at 9-10. However, this does not address the City's proffered legitimate, non-discriminatory reason for not distributing thousands of dollars in requested sick pay to Foster. Instead, Foster questions the business decision of the city when it decided to scale back on sick pay to former employees. The court will not "sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." Stewart, 207 F.3d at 378 (quoting Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir. 1999)). Moreover, it is not sufficient to prove that the reason was doubtful or mistaken. Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 541 (7th Cir. 1998). Foster must establish that the stated reason is "a deliberate falsehood." Forrester, 2006 WL 1767760, *5 (citing Farrell v. Butler Univ., 421 F.3d 609, 613 (7th Cir. 2005)). Therefore, because Foster has not established that the City's reason was pretextual, his ADEA claim must fail.

## D. Foster's ERISA Claim

### 1. ERISA- 29 U.S.C. § 1002(1)

ERISA covers "employee welfare benefit plans [that provide employees with] benefits in the event of sickness, accident [or] disability." 29 U.S.C. § 1002(1); Ruttenberg v. U.S. Life Ins. Co. of New York, 413 F.3d 652, 660 (7th Cir. 2005). Furthermore, the Secretary of Labor has

instituted an exemption that excludes certain payroll practices from ERISA coverage.
Specifically, under this regulation, an employee benefit plan shall not include:

> Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or otherwise absent for medical reasons (such as pregnancy, physical examination, or psychiatric treatment).

29 C.F.R. § 2510.3-1(b). The party who seeks to enforce the benefits governed under ERISA bears the burden to prove he is entitled to those benefits. Ruttenberg, 413 F.3d at 663.

Here, Foster cannot prove that he is entitled to any ERISA benefits. Sick leave pay made to Chicago Heights employees is drawn out of the general operating fund of the city. Because sick leave is not drawn from a separate account designated for employee benefits, Foster is not covered under ERISA. See 29 C.F.R. § 2510.3-1(b). Therefore, the sick leave pay that Foster seeks is disbursed from the general payroll, and not classified as part of an "employee welfare benefit plan." See id.

Plaintiff places a great deal of emphasis on Lindemann v. Mobil Oil Co., 141 F.3d 290 (7th Cir. 1998) for the proposition that sick leave is covered under ERISA. However, Lindemann does not hold that sick leave pay that is drawn from the same funds as a city's general operating coasts is covered under ERISA. Instead, Lindemann concerned a terminated employee and Mobil's ERISA plan which provided short term disability benefits, as opposed to the payment of sick leave for former employees. Furthermore, Lindemann did not address 29 C.F.R. § 2510.3-1(b), and its application to ERISA claims. As a result, Lindemann is not relevant to the issue before the court. Therefore, the court grants summary judgment for Defendants as to Foster's ERISA claim.

## III. CONCLUSION

For the foregoing reasons, he court denies Defendant's Motion for Summary Judgment on the political affiliation claim in Count I, and grants Defendant's Motion for Summary Judgment as to the ADEA claim in Count II, and the ERISA claim in Count III.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge

United States District Court

DATED: 7-7-06